IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HOLIDAY HOSPITALITY
FRANCHISING, INC.,

    Plaintiff,

      v.

174 WEST STREET
CORPORATION, d/b/a THE
O'CALLAGHAN HOTEL
ANNAPOLIS, d/b/a PERSIAN
PROPERTIES, LTD., et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:05-CV-1419-TWT

ORDER

       This is an action for breach of contract.  It is before the Court on the Plaintiff's

Motion for Summary Judgment [Doc. 69] and the Defendants' Motion for Summary

Judgment [Doc. 99].  For the reasons set forth below, the Plaintiff's motion is

GRANTED and the Defendants' motion is DENIED.

I. BACKGROUND

       This case arises out of a hotel franchise agreement between the Plaintiff,

Holiday Hospitality Franchising, Inc. ("HHFI") and Defendant 174 West Street

Corporation ("174 West Street").  The Plaintiff is part of the InterContinental Hotels

Group ("IHG").  IHG and its affiliates operate a system of hotel franchising under various trademarked flags including InterContinental, Holiday Inn, Holiday Inn Select and Crowne Plaza.  174 West Street is a subsidiary of The O'Callaghan Hotels Group, Ltd., an Irish company that is owned and operated by Noel O'Callaghan.  Defendant Persian Properties, Ltd. ("Persian") is also a wholly-owned subsidiary of O'Callaghan Hotels.  Persian is a defendant in this action because it guaranteed 174 West Street's franchise obligations to the Plaintiff.  (Pl.'s Ex. 1, at ¶ 4.)

In 2000, O'Callaghan Hotels was looking for a hotel investment in the United States and was approached about a potential site in Annapolis, Maryland.  In January of 2001, a representative of the Defendants contacted the Plaintiff about operating a hotel under the flags of Holiday Inn, Holiday Inn Select, or Crowne Plaza.  In response, the Plaintiff sent its Uniform Franchise Offering Circular ("UFOC") for the Holiday Inn and Crowne Plaza flag hotels.  Mr. O'Callaghan then inquired into the possibility of obtaining a Crowne Plaza flag for the Annapolis hotel, but he was told that the Plaintiff already had a signed lease agreement for that flag with another hotel in the Annapolis area.  After researching the market, 174 West Street on June 29, 2001, applied to the Plaintiff for a Holiday Inn Select franchise.  (Pl.'s Ex. 5.)  The application included a clause stating that there were no oral agreements or

understandings between the parties that were not contained in that application. (Id.,
¶ 3.)

On August 6, 2001, the Plaintiff approved the hotel as a Holiday Inn franchise.
The Plaintiff then sent another copy of the 2001 UFOC along with a proposed ten year
license agreement ("the License Agreement").   174 West Street then negotiated for
certain special stipulations within the License Agreement.  These provisions were not
included in the original contract and were specifically added at the request of 174
West Street.  The License Agreement also included a merger clause stating that: "This
is the entire agreement between the parties pertaining to the licensing of the Hotel and
supersedes all previous negotiations and agreements between the parties pertaining to
the licensing of the Hotel as a Holiday Inn or Crowne Plaza brand hotel."  (Defs.' Ex.
94, ¶ 14.D.)  The License Agreement also contained a liquidated damages provision
stipulating the amount owed to the Plaintiff by 174 West Street in the event of early
termination.  (Id., ¶ 12.C.)

174 West Street opened as a Holiday Inn on April 11, 2002.  On July 17, 2002,
it informed the Plaintiff that it intended to breach the License Agreement and
"discontinue" the franchise with Holiday Inn.  In a letter to the Plaintiff, 174 West
Street stated that it was "dissatisfied with the franchise arrangement" and that "the
brand has a poor perception in terms of quality and the rate expectation is

considerably lower than we had been lead to believe." (Pl.'s Ex. 8.)  As an alternative,

174 West Street asked to continue the franchise as a Crowne Plaza, which had since

become available.  This potential change was discussed and the Plaintiff offered the

Crowne Plaza flag, but the parties were unable to reach any agreement. 174 West

Street then stopped operating as a Holiday Inn on September 16, 2002.  As a result of

this breach, the Plaintiff formally terminated the License Agreement and then filed

this lawsuit, demanding that the Defendants pay $45,115.71 in outstanding franchise

fees and $612,811.08 in liquidated damages.  The Plaintiff and the Defendants now

move for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and

affidavits submitted by the parties show that no genuine issue of material fact exists

and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The court should view the evidence and any inferences that may be drawn in the light

most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59

(1970).  The party seeking summary judgment must first identify grounds that show

the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

### A. Defendants' Liability

The Plaintiff moves for summary judgment on its breach of contract claim, alleging that 174 West Street violated the License Agreement by failing to pay royalties.  174 West Street does not dispute that it violated the License Agreement, but contends rather that it was justified in breaching the contract.  In support of this contention, 174 West Street asserts three alternative defenses: (a) that the Plaintiff fraudulently induced it to enter the contract; (b) that the Plaintiff's violation of state and federal franchise laws act as a complete defense; and (c) that the Plaintiff breached the contract, thus justifying 174 West Street's refusal to pay any further royalties.  The Court will address each of these claims in turn.

#### 1. Fraudulent Inducement

174 West Street asserts that it was fraudulently induced into entering this contract through the Plaintiff's false statements and material omissions during the parties' negotiations.  The merger clause in the License Agreement is fatal to this claim.

In general, a party alleging fraudulent inducement to enter a contract has two options:  (1) affirm the contract and sue for breach; or (2) rescind the

contract and sue in tort for fraud.  Depending upon which of the two
courses of action is ultimately pursued, the presence of a merger clause
in the underlying contract may be determinative as to the successful
outcome. If the defrauded party has not rescinded but has elected to
affirm the contract, he is relegated to a recovery in contract, and the
merger clause will prevent his recovery. If, on the other hand, he does
rescind the contract, the merger clause will not prevent his recovery
under a tort theory.

Liberty v. Storage Trust Properties, L.P., 267 Ga. App. 905, 910 (2004) (quoting

Cotton v. Bank South, 231 Ga. App. 812, 813-814 (1998)).  Thus, to maintain a claim

for fraud where the contract contains a merger clause, a party must properly rescind

the contract.  Id.  In order for a contract to be rescinded in Georgia, "the defrauded

party must promptly, upon discovery of the fraud, restore or offer to restore to the

other party whatever he has received by virtue of the contract if it is of any value."

O.C.G.A. § 13-4-60; see also Meadow River Lumber Co. v. University of Ga.

Research Found., Inc., 233 Ga. App. 169, 175 (1998).

Here, because the contract contained a valid merger clause, 174 West Street was

required to rescind promptly the agreement and return any benefits received.  The

evidence clearly shows that 174 West Street failed to do so.  It first alerted the

Plaintiff that it intended to breach the agreement and discontinue operations as a

Holiday Inn franchise on July 17, 2002.  (Pl.'s Ex. 8.)  It then continued to operate as

a Holiday Inn for several months, accepting reservations through the Holiday Inn

system during this time.  174 West Street did not announce to the Plaintiff that it was

rescinding the agreement, however, until its June 28, 2005 response to the Complaint, a delay of almost three years from the time 174 West Street first allegedly became aware of the alleged fraud.  (Defs.' Answer, Defense No. 5.)  Georgia case law does not support 174 West Street's contention that this was a prompt rescission.  See Wender & Roberts, Inc. v. Wender, 238 Ga. App. 355, 361 (1999) ("As a general rule, rescission must occur prior to, and as a condition precedent to, the bringing of an action; it is too late to claim rescission by asserting it for the first time in the pleadings."); Bowen v. Hunter, Maclean, Exley & Dunn, 241 Ga. App. 204, 209-210 (1999) ("If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. Otherwise he cannot avoid or rescind such contract.") (quoting Brooks v. Hooks, 221 Ga. 229, 235 (1965)); Orion Capital Partners, L.P. v. Westinghouse Elec. Corp., 223 Ga. App. 539, 543 (1996) (finding as a matter of law that the buyer's seven month delay in announcing a desire to rescind was too late).  The length of the delay suggests that the alleged fraud is just a flimsy litigation-inspired excuse to avoid the consequences of what the Defendants now see as a bad deal.

Furthermore, 174 West Street continued to accept reservations through the Plaintiff's system and displayed the Holiday Inn trademark up until it began operating as an independent hotel on September 16, 2002.  (Pl.'s Ex. 11.)  174 West Street kept

these reservations and never repaid or even offered to repay the Plaintiff for its services. (O'Callaghan Dep. at 201-02; Pattison Dep. at 172.) Indeed, in its response to the Complaint, 174 West Street denied that it owed anything to the Plaintiff. (Defs.' Resp. to Pl.'s Compl., ¶ 23.) This also violates Georgia's requirements for proper rescission. See Nexus Services, Inc. v. Manning Tronics, Inc., 201 Ga. App. 255 (1991) (holding that, as a condition precedent to filing a lawsuit for rescission, a party must restore or offer to restore the consideration received). For these reasons, the Court finds that 174 West Street's attempt to rescind the contract coupled with its failure to offer repayment to the Plaintiff for benefits received did not constitute a valid rescission of the contract. Accordingly, 174 West Street cannot now sustain a claim for fraudulent inducement.

### 2. Violations of State and Federal Franchise Law

174 West Street alleges that the Plaintiff violated both Maryland and the Federal Trade Commission's franchise laws, thus providing it with a complete defense to the Plaintiff's breach of contract claim. Addressing first the Maryland franchise law claim, the "Maryland Franchise Registration and Disclosure Law" (codified at Md. Code Bus. Reg. §§ 14-201 *et seq*.) provides the rules and regulations for franchises operating in the State of Maryland. Because 174 West Street was a franchise operating and incorporated in Maryland, the parties are subject to Maryland

law.[1]  This statute prohibits a franchisor from making any "untrue statements of material fact" or omitting certain material facts.  Md. Code Bus. Reg. §§ 14-227, 14-229.  174 West Street claims that two of the Plaintiff's representatives, John Stetz and Clyde Harris, made untrue "earning statements" and omitted actual earnings information that they were required to disclose under this law.  (Defs.' Mot. for Summ. J., at 3-9.)  For the purposes of this opinion, the Court will assume without deciding that 174 West Street's allegations are true.  The civil remedies available for violations of Maryland franchise law, however, are for a court to order the franchisor to either rescind the franchise or make restitution.  See Md. Code Bus. Reg. § 14-227(c).  174 West Street seeks neither of these remedies.  It alleges rather that because the Plaintiff violated these laws, the entire contract should be ruled unenforceable as against public policy.

---

[1]The choice of law provision in the License Agreement provides that the contract "shall be governed and construed under, and in accordance with, the laws and decisions (except any conflicts of law provisions) of the State of Georgia."  (Defs.' Ex. 94, ¶ 14.B.)  Both the Supreme Court and the Eleventh Circuit require that federal courts sitting in diversity apply the choice of law rules for the state in which it sits. Manuel v. Convergys Corp., 430 F.3d 1132, 1139-40 (11th Cir. 2005) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  Thus, "under Georgia's conflict-of-law rules regarding tort cases, the substantive law of the place where the tort allegedly was committed is the law by which liability shall be determined." Young v. W.S. Badcock Corp., 222 Ga. App. 218, 218 (1996).  The alleged misrepresentations in this case were made to a franchisee residing and incorporated in the State of Maryland.  Maryland franchise law thus applies to this lawsuit.

In support of this claim, 174 West Street cites to one Maryland appellate opinion, Springlake Corp. v. Symmarron Ltd. P'ship, 569 A.2d 715 (Md. Ct. Spec. App. 1990).  In that case, the court held that a lease and leaseback arrangement could not be enforced because it violated a Maryland savings and loan regulation.  The court acknowledged that the Restatement of Contracts favored enforcement in doubtful cases, but ultimately found that public policy favored non-enforcement in this particular instance because of the egregious misconduct involved.  Id. at 719-21.

174 West Street asserts, based on this lone Maryland Court of Appeals ruling, that the Plaintiff's alleged violations of Maryland's franchising law are a complete defense in this case and allow the Defendants to keep the benefits of this contract and walk away.  As Springlake made clear, however, an entire contract will be unenforceable as against public policy only in narrow circumstances.  Id. at 719. Georgia places similar limits on the scope of this principle, authorizing its courts to declare a contract void as against public policy only in "cases free from doubt."  See Edwards v. Grapefields, Inc., 267 Ga. App. 399, 403 (2004) (quoting Porubiansky v. Emory University, 156 Ga. App. 602, 604 (1980)); McFann v. Sky Warriors, Inc., 268 Ga. App. 750, 758 (2004) (same).

Here 174 West Street asserts only that the Plaintiff's representations prior to the signing of the License Agreement violated Maryland law.  The statute in question

here, moreover, explicitly provides two remedies for violations, neither of which includes the right to void the contract after accepting and retaining benefits.  Md. Code Bus. Reg. § 14-227.  The Court thus finds that Maryland's franchise laws do not authorize this Court to void an otherwise valid contract.  Furthermore, because 174 West Street waited three years before claiming a right to rescind the contract and still has not repaid the Plaintiff for some of the benefits it received, the Court finds no cause now to order rescission of this contract or other restitution to the Defendants.

174 West Street next claims that the contract should be invalidated because the Plaintiff violated FTC franchise regulations.  These regulations make it "an unfair or deceptive act or practice within the meaning of section 5 of [the Federal Trade Commission Act] for a franchisor" to make certain statements or fail to provide certain information regarding earnings.  See 16 C.F.R. § 436.1.  As 174 West Street acknowledges, the FTC's franchise disclosure laws do not create a private right of action.  See G&R Moojestic Treats, Inc. v. Maggiemoo's Intern., LLC, 2004 WL 1110423, at *9 (S.D.N.Y. 2004) (citing Alfred Dunhill Ltd. v. Interstate Cigar Co., Inc., 499 F.2d 232, 237 (2d Cir. 1974)); Brill v. Catfish Shaks of America, Inc., 727 F. Supp. 1035, 1041 (E.D. La. 1989); Freedman v. Meldy's, Inc., 587 F. Supp. 658 (E.D. Pa.1984).  The Defendants claim, however, that the Plaintiff's violation of these

regulations nonetheless constitutes a complete defense.  In support, 174 West Street cites to a 180 year-old Supreme Court opinion in which the court stated:

> where the contract grows immediately out of, and is connected with, an illegal or immoral act, a Court of justice will not lend its aid to enforce it.  And if the contract be in part only connected with the illegal transaction, and growing immediately out of it, though it be, in fact, a new contract, it is equally tainted by it.

Armstrong v. Toler, 24 U.S. 258, 261 (1826).  The Defendants then offer several cases where a court invalidated a contract for statutory or regulatory violations even where the law did not specifically provide such relief.  (Defs.' Mot. for Summ. J., at 13) (citing United States v. Mississippi Valley Generating Co., 364 U.S. 520, 563 (1961), Resolution Trust Corp. v. Home Sav. of America, 946 F.2d 93, 96 (8th Cir. 1991), and Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 844 (2d Cir. 1952)).  These cases are inapposite, however, because there existed in each a close nexus between the statutory or regulatory violation and the contract at issue.  Indeed, in Resolution Trust Corp., 946 F.2d at 96, the repurchase agreement entered into by the parties was itself in violation of a federal regulation.  In Mississippi Valley Generating Co., 364 U.S. at 563, the statute, a conflict of interest prohibition, explicitly restricted government officials from becoming involved in negotiating contracts where that official held a pecuniary interest.  The Supreme Court thus concluded that because the statute's primary purpose was to protect the public from corruptive influence, that intent would

not be fully accorded unless the government had the ability to disaffirm contracts tainted by a government agent's self interest.  Id. at 563.  Kaiser-Frazer Corp., 195 F.2d at 844, is also unhelpful.  In that case, an automobile manufacturer, as part of a sale of stock to its underwriters, provided a prospectus that contained a material error. Because of this falsity, the Second Circuit concluded that a sale of this stock to the public would have been a violation of the Securities Act of 1933.  Id.  The court thus found that a contract for sale of securities to underwriters was so closely related to the performance of acts violating the law that it made the underlying contract illegal. Therefore, in each of these instances, the at-issue contract grew immediately out of an illegal transaction, which permitted the court to find the contract unenforceable.

The Court finds the Plaintiff's citations thoroughly unpersuasive in this instance for several reasons.  First, the alleged violation in this case is regulatory rather than statutory.  In the only cited case involving the non-enforcement of a contract based on the violation of a regulation rather than a statute, the Eighth Circuit determined that the contract itself expressly violated the regulation.  See Resolution Trust Corp., 946 F.2d at 96.  Here, by contrast, the License Agreement is in no way violative of any provision of 16 C.F.R. § 436.1.

Second, the close nexus between the alleged violation and the disputed contract does not exist here.  The Plaintiff's alleged FTC violations consist only of a few items

of correspondence exchanged between the parties in the months prior to the signing of the License Agreement.  Far from operating solely based on these representations, the Defendants also retained an independent consultant to conduct a market study and analysis to guide their branding decision.  (Pattison Dep., Ex. 8.)  Both the franchise application and the License Agreement, moreover, contained a merger clause stating that the contract itself was the entire agreement between the parties.  (Pl.'s Ex 1; Ex. 5.)

Finally, the Defendants have not cited – and the Court cannot find – any case in which a court has voided an otherwise valid and enforceable franchise agreement because of regulatory violations.  Rather, at least one court has held that a franchisee cannot terminate or void a franchise agreement based on such violations.  See LeBlanc v. Belt Center Inc., 509 So.2d 134, 137 (La. Ct. App. 1987).  For all these reasons, the Court declines to void the License Agreement based on any putative FTC regulatory violations.

### 3. Breach of Contract

174 West Street claims, finally, that the Plaintiff's motion for summary judgment should be denied because the Plaintiff breached the License Agreement. 174 West Street cites to the "Maintenance of Standards" provision in the License Agreement in which the Plaintiff agreed to:

> [C]onscientiously seek to maintain high standards of quality, cleanliness, appearance and service of all hotels using the System so as to promote, protect and enhance the public image and reputation of the Holiday Inn and Crowne Plaza names and to increase the demand for services offered by the System.

(Defs.' Ex. 94, ¶¶ 4.D, 5.C.)  In support of its allegation that the Plaintiff failed to comply with this contractual promise, 174 West Street offers statements made by Stevan Porter, the president of the Americas for the Plaintiff's parent, IHG.  In an article published by "Hotel & Motel Management," Porter stated there were certain Holiday Inns that needed to exit the system.  (Defs.' Ex. 223.)  Another article quoted him as stating that in 2002 the company was "bloated, uncoordinated, and slow to react" and the quality of the system at that time was "unacceptable to our guests." (Defs.' Ex. 224.)

Assuming *arguendo* that the president of the Americas' statements are even admissible, the Court finds that this evidence does not create a genuine issue as to whether the Plaintiff breached any provision of the contract.  The License Agreement provided the Plaintiff with the discretion to improve the quality of the system as it saw fit and that the Plaintiff's "judgment in such matters shall be controlling in all respects, and it shall have wide latitude in making such judgments."  (Pl.'s Ex. 1, ¶ 4.D.)  Taken in context, the articles detail Holiday Inn's continued efforts to strengthen its brand.  Indeed, the president's statements demonstrate his exercise of

reasoned judgment to recognize that the system needed improvement and to protect and maintain Holiday Inn's public image by removing inferior hotels from the system. Moreover, as 174 West Street has not produced any admissible evidence that a single customer did not stay at its hotel as a result of this alleged violation of the contract, the Defendants have failed to link this breach to any injury suffered.  The Defendants' breach of contract claim fails as a matter of law.

B. Liquidated Damages

174 West Street also challenges the liquidated damages provision in the License Agreement, alleging that it is a penalty and is thus unenforceable.  "The issue of whether a provision constitutes liquidated damages rather than a penalty is an issue of law."  National Emergency Servs., Inc. v. Wetherby, 217 Ga. App. 42, 44 (1995). "To decide whether the provision is enforceable, the court must determine if (1) the injury caused by the breach is difficult or impossible to accurately estimate, (2) the parties intended to provide for damages rather than a penalty, and (3) the stipulated sum is a reasonable pre-estimate of the probable loss."  Allied Informatics, Inc. v. Yeruva, 251 Ga. App. 404, 405 (2001).  The burden of showing that a provision of a contract is unenforceable lies with the defaulting party.   Joyce's Submarine Sandwiches, Inc. v. California Public Employees' Ret. Sys., 195 Ga. App. 748, 749-50 (1990); Liberty Life Ins. Co. v. Thomas B. Hartley Constr. Co., Inc., 258 Ga. 808, 809

(1989).  In cases of doubt, Georgia courts favor a construction which holds the stipulated sum to be a penalty and limits the plaintiff to a recovery of actual damages. Fortune Bridge Co. v. Department of Transp., 242 Ga. 531, 532 (1978); Adams v. D & D Leasing Co. of Ga., Inc., 191 Ga. App. 121, 122 (1989).

The first two considerations – difficulty of injury estimation and the parties' intent – are not in dispute in this case.  174 West Street argues only that the amount of liquidated damages is unreasonable.  According to the License Agreement, the Plaintiff receives liquidated damages in the amount of "(1) 36 times the monthly average of such amounts for the period during which the Hotel has been in operation in the System, or (2) 36 times such amounts as are due for the one month preceding such termination."  (Defs.' Ex. 94, ¶ 12.F.)  According to the Plaintiff, three years is the approximate amount of time it takes to replace a property when the franchisee breaches the agreement resulting in early termination.  (Merkin Dep. at 16-17.)  The Defendants have not disputed this.  The License Agreement – including the liquidated damages provision – was the result of arm's-length negotiations between sophisticated parties, each of whom had access to financial, marketing, and legal professionals.

174 West Street has presented evidence showing that the Plaintiff is required under its "master license agreement" with its parent company to pay approximately 95% of its collected royalties to the parent in exchange for the parent's support.

(Merkin Dep. at 44-54; Defs.' Ex. 151, at G-2.)  174 West Street thus argues that the liquidated damages provision is unreasonable because it requires payment of the Plaintiff's gross revenues, rather than just its profits, for the three years. Georgia law is ambiguous in this area.  For example, in <u>Adams</u>, 191 Ga. App. at 121, the Georgia Court of Appeals emphasized that the "[t]he measure of damages for the lessee's breach of contract is the cash value of the contract less any saving which may accrue from the breach." <u>Id.</u> at 123 (<u>quoting</u> <u>Bennett v. Assoc. Food Stores, Inc.</u>, 118 Ga. App. 711, 715 (1968)).  In <u>Adams</u>, an automobile dealer attempted to enforce a liquidated damages provision in a lease agreement that permitted it to accelerate payment of the entire lease, even though there was no reduction to present value.  The court found that it was "manifestly unreasonable and oppressive" to permit a recovery bearing no reasonable relation to the dealer's probable actual damages. <u>Id.</u> Similarly, in <u>Jefferson Randolph Corp. v. Progressive Data Sys., Inc.</u>, 251 Ga. App. 1 (2001), <u>reinstated in relevant part</u>, 258 Ga. App. 304 (2002), the Georgia Court of Appeals stated that:

> Where there is a loss of future business earnings, this is a recovery for lost future profits after the projected expenses of earning the projected revenue has been deducted and not the recovery of the gross revenue collected, because the claimant is not permitted to recover expenses never incurred, putting him in a better position than if the contract had been performed.

Id. at 5.  The court thus found that a liquidated damages provision that called for acceleration of all future licensing fees was an unenforceable penalty.

In this case, however, the 95% pass through is not really an expense that is avoided when the franchise is terminated.  The franchise system loses 100% of the franchise fees.  It is not put in a better position than if the contract had been performed.  The Defendants have not produced any evidence that, for example, the parent company would spend less on advertising once 174 West Street left the Holiday Inn system.  See P & M Vending Co., Inc. v. Half Shell of Boston, Inc., 579 P.2d 93, 95 (Colo. Ct. App. 1978) (ruling that a cigarette vending machine operator could recover liquidated damages based on lost revenue because it had demonstrated that there would be only minimal difference between revenues and profits).  In a ten year deal, three years of revenue as liquidated damages is heavy but not unreasonable.  It is a reasonable attempt to quantify the Plaintiff's lost opportunity costs in not having a Holiday Inn in the Annapolis market.  The Court will not invalidate the liquidated damages provision of the contract based upon hypothetical facts that bear no relation to the facts of this case.

## IV. CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment [Doc. 69] is GRANTED and the Defendants' Motion for Summary Judgment [Doc.

99] is DENIED.   The Plaintiff is directed to file a proposed judgment.   The

Defendants have ten (10) days in which to file objections to the proposed judgment.

SO ORDERED, this 19 day of July, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge